UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
EMI ENTERTAINMENT WORLD, INC., : **CIVIL ACTION NO.:**
: 05 CV 390 (CSH)
Plaintiff, :
:
v. :
:
KAREN RECORDS, INC., KAREN PUBLISHING :
INC., BIENVENIDO RODRIGUEZ, ISABEL :
RODRIGUEZ AND FIDEL HERNANDEZ, :
:
Defendants. :
------------------------------------------------------------X

## **DECLARATION OF CHRISTOS P. BADAVAS**

CHRISTOS P. BADAVAS, pursuant to 28 U.S.C. § 1746, hereby declares under the penalties of perjury that the foregoing is true and correct:

1.  I am Vice President of and Senior Counsel to The Harry Fox Agency, Inc. ("HFA"), and make this Declaration based upon my personal knowledge and my review of the books and records of HFA and Plaintiff EMI Entertainment World, Inc. ("EMI") to the extent maintained by HFA. Although HFA is not a party to this action, it has acted as EMI's authorized agent at all times relevant hereto. I submit this declaration in support of Plaintiffs' Motion for Summary Judgment.

2.  This is a straightforward case of copyright infringement. Based on HFA's business records and Defendants' own documentation and admissions, there can be no dispute that Defendants knowingly and willfully used four of EMI's copyrighted compositions without authorization by producing and distributing phonorecords containing these compositions. While Defendants requested licenses for each of the compositions in suit, no licenses were ever issued for any of the songs. Moreover,

Defendants habitually failed to make royalty payments in connection with previously-issued license and used many other compositions owned by HFA's publisher-principals.

3.      Thus, although this action is limited to Defendants' unauthorized use of four specific compositions, Defendants' conduct must be viewed in the context of their longstanding failure to timely and fully comply with their royalty and reporting obligations and their knowing failure to rectify their continuous infringing conduct. As detailed herein, Defendants' activities previously have engendered numerous copyright infringement actions, a still-unresolved royalty examination and termination of Defendants' licensing privileges by HFA on behalf of all of its publisher-principals with respect to the issuance of any licenses to Karen.[1] Given this history, Defendants' unauthorized use of EMI's compositions was willful, and EMI is entitled to summary judgment herein.

## I.   PLAINTIFF AND THE MECHANICAL LICENSING PROCESS

4.      Plaintiff is the corporate parent of three wholly-owned music publishers (EMI Blackwood Music, EMI Melograf and EMI April Music) that own or control all or part of the four musical compositions at issue in this lawsuit (the "Compositions", as more particularly described in ¶ 18, *infra*.). Plaintiff is engaged in the business of publishing, licensing and otherwise marketing and exploiting its subsidiaries' copyrighted musical compositions.

5.      HFA is a music industry organization representing almost 35,000 music publisher-principals, including EMI, who grant HFA the authority to license their musical

---

[1]     Karen Records, Inc. and Karen Publishing, Inc. are collectively referred to herein as "Karen" or "Defendants." HFA's relationship to each entity is described in more detail below.

works on their behalf. Under the United States Copyright Act, 17 U.S.C. §1, et seq. (the "Copyright Act"), an owner of a copyright in a musical composition has the exclusive right to make and distribute sound recordings of the composition.

6. Section 115 of the Copyright Act qualifies these exclusive rights. Under Section 115, once the copyright holder permits a first reproduction of the copyrighted composition, anyone who complies with Section 115's provisions concerning notice to the copyright holder, payment of a prescribed royalty for each phonorecord produced and distributed, and delivery of the prescribed accountings may reproduce and distribute audio-only recordings to the public for private use. Licenses that permit the recording and distribution of musical compositions embodied in compact discs, cassettes or LPs, among other formats, are commonly referred to as "mechanical" licenses. HFA serves as a "one stop shop" for most mechanical licensing in the United States; it collects and distributes royalties to its publisher-principals from the sale of licensed recordings.

7. Record companies may obtain a mechanical license pursuant to the provisions of the Copyright Act, directly from the publisher/owner of the copyrighted musical composition, or, as is most often the case, from HFA. Unless otherwise agreed to by the copyright owner, in exchange for a mechanical license, the licensee must pay the statutorily established royalty, currently $00.091 per unit, for all units produced, manufactured or distributed by the record company. *See* 17 U.S.C. § 115. The licensee must also submit regular accountings of its sales and otherwise comply with the terms of the license.

8. All HFA licenses and most licenses issued directly by publishers are limited to a recording by a specific artist or artists that is released on a unique album. *See*

HFA's standard Terms and Conditions annexed as Exh. A. hereto.[2] As a result, a record company needs to obtain a separate license for every separate use of a copyrighted composition.

9. HFA has regular procedures in place for record companies and others to easily obtain such mechanical licenses. Record labels and others may request a mechanical license from HFA by mail, fax or the Internet. Upon receipt of a license request, HFA generally will transmit an offer to license which must be counter-signed by the applicant and returned to HFA together with any advance royalty payments that may be required.

10. Because of the large volume of license requests received by HFA, licenses are not reviewed on an individual basis. Nevertheless, every license request is assigned a unique transaction number so that HFA may track the progress of requests as they are processed. Not until a license is countersigned, returned to HFA, entered into our systems and coded as signed is a license effective. In cases where a licensee is not in good standing (e.g. delinquent in its payments), HFA will place a hold on all license requests to prevent its systems from automatically generating and mailing offers to license for countersignature.

11. When circumstances require, HFA will terminate licenses following notice of non-payment pursuant to the Section 115 of the Copyright Act and sponsor copyright infringement lawsuits brought by its publisher-principals. For the account of Karen Records, under which the Karen label applied for licenses for each of the Compositions herein, HFA placed a "license hold" in 1997 on the granting of any license requests to

---

[2] The terms and conditions are printed on the reverse side of every license issued by HFA on behalf of its publisher-principals.

Karen and terminated all then-existing licenses due to Defendant's failure to pay royalties and subsequent failure to settle a 2000 royalty audit (which still remains outstanding). Defendant's history with HFA and its habitual delinquencies are detailed in Section IV herein.

## II.   HFA'S ACCOUNTS WITH KAREN

12.   HFA maintains both "publisher accounts" and "manufacturer accounts." Music publishers affiliated with HFA own or control the copyrighted compositions that HFA licenses. Manufacturers are the record companies who wish to use the copyrighted compositions on their recordings.

13.   During the course of this litigation, Defendants' respective counsel have attempted to ignore the existence of Defendant Karen Records, Inc. ("Records") as an entity seeking licenses from HFA or grouped Records with Defendant Karen Publishing, Inc. ("Publishing") when discussing which entity had what relationship with HFA. Defendants' purposeful ambiguity aside, only Records could request and obtain mechanical licenses for the phonorecords that were produced and distributed under the Karen label, because only Records had a "manufacturer account" with HFA. Records failed to obtain any licenses with respect to the Compositions at issue.

14.   As detailed below, because of the "license hold" in place since 1997, virtually no licenses could be issued or were issued to Karen. With the exception of a small subset of licenses processed directly by another HFA publisher-principal without HFA's involvement, all of Karen's requests for licenses were "held" and never "signed". *See* License Downloads for Records annexed as Exhibit B1 (complete licensing history)

and Exhibit B2 ("held" licenses since 1998).[3]

## A. Records' Account

15. By way of background, Records established a "manufacturer account" in 1986 (Account # M4213Z). (See Exh. C hereto). Unlike HFA's publisher-principals who own or control the copyrighted compositions that HFA licenses, manufacturers are the ones who need the licenses to use the copyrighted compositions on their recordings and must first obtain a license from the music publisher either directly or through HFA before manufacturing or selling the phonorecord.

16. Since 1986, Records has applied for nearly 500 mechanical licenses from HFA. The complete licensing history annexed as Exh. B1 demonstrates both the continuous and exclusive use of the Records' "manufacturer account" with HFA to request licenses for phonorecords produce by Karen between 1986 and 2004. It also evidences the number of license requests that were never processed (because of the 'license hold' resulting from Records non-payment of royalties).

## B. Publishing's Accounts

17. Publishing, on the other hand, set up a "publisher account" with HFA in 1994 and was assigned Account # P52579 (see Exh. D). That account authorized HFA to issue mechanical licenses to manufacturers for compositions owned or controlled by Publishing, just as HFA does for EMI and its thousands of other publisher-principals. In 2004, several years after the manufacture and distribution of each of the infringing recordings containing embodiments of the Compositions, Publishing established a

---

[3] Each entry is coded by HFA with the status of the license: "S" for "signed", "H for "held", "V" for "void", "N" for "new" or with one of several other designations depending on the particular circumstances. As discussed in Paragraph 10, only "signed" or "S" licenses are effective.

"manufacturer account" with HFA in 2004 (Account # M1566L) (see Exh. E). But, it is important to note that Publishing did not have a "manufacturer account" in place at the time Karen needed to request licenses for any of the Compositions in suit. Indeed, Publishing has requested just three licenses from HFA under its "manufacturer account". See Exh. F.[4]

### III. THE COMPOSITIONS IN SUIT

18. Four copyrighted compositions are the subject of this infringement action:

(i) *La Colegiala* written by Grover Walter Leon Aguilar, Copyright Registration No. PA-693-423 dated March 28, 1994 (Claimant Ediciones Musicales Hispanas, S.A. c/o EMI April Music Inc.);

(ii) *Corazon Partio* written by Alejandro Sanz, Copyright Registration No. PA 940-495 dated March 29, 1999 (Claimant Ego Musical, S.A. c/o EMI Blackwood Music Inc.);

(iii) *Cuando Acaba El Placer*, written by Nacho Mano, Copyright Registration No. PA-1-043-897 dated March 27, 2001 (Claimant Edicoe Musicais Topajo Ltda. c/o EMI Blackwood Music Inc.); and

(iv) *Fuiste Mia Un Verano*, written by Leonardo Favio and Vico Berti, Copyright Registration No. PA 739-947 dated December 2, 1994 (Claimant EMI Melograf, S.A.).

The foregoing copyrighted compositions shall collectively be referred to as the "Compositions."

---

[4] One license was granted because there was no hold in place on Publishing's new account and the publisher instructed HFA to mail the offer to license. Two license requests were held pending receipt of certain documentation related to the new account.

19. True and accurate copies of the registration certificates issued by the Copyright Office (collectively, the "Registration Certificates") are annexed hereto as follows: *La Colegiala* (Exhibit G); *Corazon Partio* (Exhibit H); *Cuando Acaba El Placer* (Exhibit I); and *Fuiste Mia Un Verano* (Exhibit J).

20. The copyright registrations for each of the Compositions remain in full force and effect.

21. As stated on each of the Registration Certificates, EMI's wholly-owned subsidiaries are the copyright Claimants and entitled to all rights and benefits conferred by the Copyright Act.

## IV. KAREN'S CONTINUING FAILURE TO PAY ROYALTIES

22. As noted above, Defendants have repeatedly had problems with making timely royalty payments and accountings to HFA. As a result of Karen's transgressions, HFA's publisher-principals have had to commence several copyright infringement actions based on Defendants' failure to pay royalties:

a) *Kubaney Publishing, v. Karen Records, Bienvenido Rodriguez and Isabel Ruiz [Rodriguez]*, 85-0262-Civ-Spellman (SDFL 1985) and three related cases (the "Kubaney Litigation");

b) *Dino Nicolosi d/b/a D'Nico International and Anahi Music v. Karen Records, Karen Publishing, Bienvenido Rodriguez et al* (98-cv-03843 (WHP) (SDNY 1998) (the "D'Nico Litigation"); and

c) *Peer International and EMI Entertainment World v. Karen Publishing, Karen Records and Bienvenido Rodriguez*, 00-cv-04599 (LAP) (SDNY 2000) (the "Peer Litigation").[5]

23. The Kubaney Litigation, which was based on Karen's unauthorized use of

---

[5] Copies of the docket sheets for the D'Nico Litigation and the Peer Litigation are annexed hereto as Exhs. K and L, respectively.

copyrighted compositions, was commenced against Records before it had an account with HFA. As part of the subsequent settlement, Records set up its "manufacturer account" with HFA in August 1986. See Exh. C. According to Defendant' own admissions and corporate records, this was just a year after Karen Publishing was formed in August 1985.[6] As noted below, Publishing would not set up a "publisher account" with HFA until 1994.

24. Karen's habitual delinquency came to a head in 1997. In May 1997, HFA wrote to Karen to advise that royalties were outstanding from the prior December and that certain licenses would be terminated in the event it failed to correct the default. Exh. M.

25. Karen belatedly made the outstanding payments, although without the required interest and late fees. It never became current and always remained in default on its quarterly obligations, engendering further correspondence from HFA. By letter dated July 18, 1997, HFA wrote on behalf of publisher D'Nico International ("D'Nico") notifying Karen that the licenses for specified compositions owned by D'Nico would be terminated if Karen did cure its various defaults within thirty days. Exh. N.

26. Karen again failed to stay current and, in September 1997, HFA wrote to Bienvenido on behalf of all of its publisher-principals whose compositions were licensed to Karen to advise Karen that absent payment within thirty days of royalties and late payments and interest due, all of the licenses issued to Karen would be terminated. Exh. O.

27. When Karen failed to make the required payment, HFA terminated all

---

[6] See Bernstein Decl., Exh. D.

outstanding licenses and placed a total hold on the account preventing the issuance of any new licenses (the "License Hold") as of November 4, 1997.

28. Following Karen's failure to cure the defaults detailed in HFA's May, July and September 1997 notices, D'Nico and Anahi Music commenced the D'Nico Litigation for copyright infringement based on Karen's failure to pay royalties for several compositions embodied on one particular album produced by Karen.

29. As part of the subsequent settlement of the D'Nico Litigation, Karen consented to an audit of its books and records and D'Nico and Anahi allowed Karen to continue manufacturing the phonorecord that was the subject of the litigation. HFA did not agree to reinstate any of the other revoked licenses and did not lift the License Hold.

30. In early 1999, HFA (through the Prager & Fenton accounting firm) conducted a royalty examination of Karen for the period January 1, 1992 through December 31, 1998 (the "Royalty Examination"). *See* Royalty Examination Report annexed hereto as Exh. P.

31. The Royalty Examination concluded that Karen owed more than $500,000 (including interest) to HFA's publisher-principals. *Id.*

32. Karen was slow to respond to Prager & Fenton and HFA's demands throughout 1999 to resolve the royalty examination. Despite numerous inquiries from Prager & Fenton, Karen first sent a technical inquiry from its own accountant in October 1999 and then offered various excuses for its delay. Exh. Q.

33. Karen continued to be delinquent in its reporting and payment responsibilities during this period while continuing to release phonorecords with unlicensed compositions. According to the License Download, Karen released for

albums in 1999 with 22 unlicensed compositions.[7] See Exh. B2.

34.    In July 1999, Karen released a phonorecord entitled "Mas Romantico" (Record # K-213) which contained recordings of two of the Compositions herein, *Corazon Partio* and *Cuando Acaba El Placer*. Bernstein Decl. Exh. I. Copies of HFA's "License Inquiry Detail" for the license requests for these two Compositions are annexed hereto as Exhs. R and S, respectively. As detailed in the Bernstein Decl., "Mas Romantico" was still in distribution and available for sale in New York City in 2003. Bernstein Decl., Exh. F.

35.    In December 1999, Karen released a phonorecord entitled "Bomba 2000" (Record # K-220) which contained a recording of *Fuiste Mia Un Verano*. A copy of HFA's "License Inquiry Detail" for the license requests for this Composition is annexed hereto as Exh. T. As detailed in the Bernstein Decl., "Bomba 2000" was released twice by Karen, first as Record # K-220 and in October 2000 as Record # K-236. Bernstein Decl. Exh. L. The second release was still in distribution and available for sale in New York City in 2003. Bernstein Decl. Exh. F.

36.    In January 2000, HFA wrote to Bienvenido to advise that as a result of Karen's failure to resolve the Royalty Examination, HFA was returning five checks tendered by Karen for unauthorized uses of its publisher-principals' compositions. Specifically, these payments covered the royalties for the last quarter of 1997 and all four quarters of 1998. HFA also tendered its own check in re-payment of royalties paid by Karen for the first two quarters of 1999, less appropriate royalties for the D'Nico and Anahi compositions which were accepted under the terms of the D'Nico Litigation

---

[7]    These totals are based on the license requests which were submitted by Karen to HFA and the information provided by Karen on such requests.

settlement. Exh. U.

37. HFA further reminded Bienvenido that "all authority under the licenses which were the subject of the [1997] revocation notice remain revoked and terminated due to Karen's failure to timely and properly cure its defaults." *Id.*

38. In June 2000, HFA again refunded royalties to Karen that it had paid for unauthorized uses over the prior three quarters. Exh. W. HFA's June 2000 letter again notified Karen that the manufacture or distribution of any phonorecords containing unlicensed compositions was unauthorized and at Karen's "considerable peril."

39. On June 21, 2000, Peer Music and EMI commenced the "Peer Litigation" against both of the Corporate Defendants and Bienvenido based on Karen's unauthorized use of eighteen compositions. Exh. L.

40. Despite the June 2000 reminder that all but several D'Nico and Anahi licenses had been terminated and the pendency of the Peer Litigation, Karen continued to manufacture and release new albums containing unlicensed compositions and failed to take any steps to remove prior phonorecords from the marketplace.[8]

41. As demonstrated by the License Download, Karen continued to release albums in 2000, which albums contained nine unlicensed compositions. Exh. B2. As noted, Karen re-released "Bomba 2000" in October 2000.

42. These records were released although HFA had not issued licenses to Karen due to the ongoing License Hold.

43. Thereafter, negotiations to settle the Peer Litigation and the Royalty Examination proceeded on separate tracks with the lawyers handling the litigation and

---

[8] *See* Exh. X hereto (renewed license requests by Karen Records in July 2000 for recordings released in 1993 and 1994).

677033v4   008603.0117                                12

Prager & Fenton and Fidel Hernandez handling the audit.

44. After many communications between Prager & Fenton and Karen, in December 2000, Hernandez proposed a revised settlement of the Royalty Examination for $224,439.47. HFA accepted the offer and Prager & Fenton forwarded a draft settlement agreement. Karen proposed some textual revisions but did not object to the settlement amount. Exh. Y. Further discussions ensued and Karen requested forbearance as it was in the midst of settlement of the Peer Litigation.

45. Based in part upon the knowledge that the Royalty Examination would be settled as per the December 2000 agreement, Peer and EMI agreed in April 2001 to settle the Peer Litigation in exchange for Defendants' payment of $125,000 in royalties and attorneys' fees related to the compositions in that suit. Defendants were also required to acknowledge that they had become aware that HFA had revoked all licenses at the time the D'Nico Litigation was commenced in June 1998. Settlement Agreement dated as of April 1, 2001 (the "Peer Settlement Agreement", Exh. Z), ¶¶ III, VI.[9]

46. The Peer Settlement Agreement also provided that the licenses previously issued by HFA to Karen for eight specified compositions embodied on phonorecords distributed by Karen during the three years prior to the 2003 commencement of the Peer Litigation were deemed to be restored. Id. ¶ 3. The Peer Settlement Agreement did not restore any other licenses that had been revoked nor did it mention the License Hold. Id.

47. After the Peer Settlement Agreement was executed, a new attorney retained by Karen wrote to Prager & Fenton by letter dated May 11, 2001 and made a new settlement offer for $120,000, ignoring the prior audit agreement. Exh. AA.

---

[9] The Peer Settlement Agreement was signed by Bienvenido individually and on behalf of both Records and Publishing.

48. HFA responded on June 21, 2001 that the offer was unacceptable and that audit settlement discussions would be suspended if Karen did not consent to the earlier settlement amount by June 29, 2001. Exh. BB.

49. Karen's counsel responded by acknowledging that Bienvenido had "tentatively agreed to a settlement of about $200,000", but that Bienvenido "had not consulted with New York counsel as to the law of statute of limitations, methodology, statutory interest, case law, etc." Exh. CC. Karen's counsel stood by his May 11th settlement offer and HFA's "License Hold" continued in place.

50. In November 2001, Karen released an album entitled "Grandes Exitos de Alex Bueno en Bachata" (Record # K-252) which contained the copyrighted composition *La Colegiala*. Bernstein Decl. Exh. J. A copy of HFA's "License Inquiry Detail" for the license request for this Composition is annexed hereto as Exh. DD[10]. As detailed in the Bernstein Decl., "Grandes Exitos de Alex Bueno en Bachata" continued to be distributed nationally and was still available for retail purchase in New York City in July 2003. Bernstein Dec., Exh. G.[11]

51. Intermittent communications between attorneys for HFA and Karen continued through 2002 and 2003 but with no resolution. During this period, Karen failed to report or make any payment to HFA for more than two years.[12] In July 2003,

---

[10] *La Colegiala* was one of the compositions for which Karen attempted to obtain a license directly from the publisher. While Karen obtained EMI's "permission" for HFA to issue a license (Exh. EE), neither EMI nor HFA ever issued a license to Karen for this song on this album as a result of the License Hold.

[11] "Mas Romantico", "Bomba 2000", and "Grandes Exitos de Alex Bueno en Bachata" are collectively referred to hereinafter as the "Infringing Recordings".

[12] See fn. 13, *infra* and Exh. II.

HFA's attorneys wrote to Karen's counsel to try and complete the prior settlement agreement. Exh. FF. HFA's counsel reminded Karen that HFA and its publisher-principals only agreed to settle the Peer Litigation because of the pendency of the Royalty Examination settlement. HFA's counsel also noted that it was aware of several Karen recordings currently in distribution that contained unlicensed compositions owned by HFA's publisher-principals. Id.

52. Karen's counsel did not respond.

53. In January 2004, Publishing set up a new "manufacturer account" and thereafter applied for three licenses for songs used on Karen phonorecords. These licenses were automatically granted because there was no hold in place on Publishing's new account.[13]

54. Karen did not resume royalty reports or payments until November 2004 when it submitted payment and reports for four quarters (3rd and 4th Quarter 2003 and 1st and 2nd Quarter 2004). Exh. GG

55. Perhaps not surprisingly, Karen's payment came just weeks after HFA sent an additional termination notice that served to reiterate the prior revocation and cancelled any pending (held) license requests. Exh. HH. Six weeks later, EMI filed the instant action.

56. Because of the pendency of the current lawsuit, HFA began holding Karen's royalty payments – starting with the four checks each dated November 17, 2004 for four prior quarters in 2003 and 2004 – in a segregated account. HFA will not distribute any of these payments to its publisher-principals until there is a resolution of

---

[13] HFA placed a License Hold on Publishing's manufacturer account in April 2007. Exh. E.

the ongoing dispute with Karen. Meanwhile, HFA's practice has been to stamp all checks that it cashes with the following legend: "Without Prejudice to Claims of Underpayment. Endorsement of this Check Shall Not Constitute Acceptance of Any Unlicensed Uses or an Implied License Thereof."

## V.  KAREN'S RECENT PAYMENT HISTORY

57.  Because Defendants have raised the payment of royalties as an affirmative defense to EMI's four counts of infringement, the timing and sufficiency of Karen's payments bears comment. HFA generated a "cash receipts" report from its records showing the actual payments made by Karen, the period for each payment and the date deposited by HFA. See Exh. II.[14]

58.  Most notable about Karen's payment history since 2001 is the fact that Karen did not make <u>any</u> royalty payments for the 3rd and 4th Quarters of 2002 and the 1st and 2nd Quarters 2003.[15] Id.

59.  In addition, the report demonstrates how late each of Karen's payments was made. As repeatedly noted above, Karen never paid its royalties on time and often only after HFA made a demand. And, Karen went almost three years without making any

---

[14] The period is reported with a "3" in front of the applicable month and year, meaning "three months ending."

[15] As set forth in the "cash receipts" report, there was a gap of more than two years between the first two quarterly payments for 2002 that were deposited in September 2002 and the four quarterly payments for the last two quarters of 2003 and the first two quarters of 2004. Karen has not produced any proof of payment for these missing quarters (3rd and 4th Quarters 2002 and 1st and 2nd Quarters 2003). Further, HFA has no record of receipt, deposit, refund or return of checks for any of these missing quarters. Pursuant to the Court's January 22, 2008 decision on EMI's Motion to Compel, Defendants are now precluded from producing any further proof of payment and receipt by HFA for these missing periods.

payments to HFA.

60. Equally significant is the amount of royalties paid by Karen between 2001 and 2005. Using the quarterly royalty reports produced by Defendants (collectively annexed hereto as Exh. JJ), EMI's counsel generated a chart with the amount of units sold and payments made (or deducted, in the case of "returns") for each of the Compositions for each quarter in 2001-2005. Exh. KK.[16] The royalty chart shows that average royalty (total royalty divided by total units) paid by Karen for *Cuando Acaba La Placer* and *Corazon Partio* (which were on the same record) was only $00.037 per unit while the statutory rate averaged $00.080 over the same period.[17] For *La Colegiala*, Karen paid an average of $00.066 per unit. For *Fuiste Mia Un Verano*, Karen did not pay any royalties during this five year period and instead claimed returns for each quarter in its royalty reports. Further evidence of Karen's non-payment of royalties for *Fuiste* is Karen's "Reporte Hecho A La Harry Fox" (fact report to Harry Fox) which evidences that 3,033 units "no reportada" (were not reported). Exh. LL.

61. In sum, although Karen did attempt to make royalty payments with respect to its infringing recordings, the payments were always late and always insufficient. Moreover, because Karen's recordings were not licensed, the royalties paid in to HFA for these unauthorized uses were never distributed to HFA's publisher-principals. Thus,

---

[16] The royalty reports submitted herewith are complete copies (in Bates stamped order) of the relevant pages (just those covering the Compositions) produced by Defendants in this litigation. The haphazard and incomplete nature of some of these reports (e.g. missing headings, missing or inaccurate dates, and illegible numbers), is the same as the complete reports that were originally submitted by Karen to HFA as set forth above.

[17] The statutory mechanical royalty rates for the same period were as follows:
1/1/00 – 12/31/01  $00.0755; 1/1/02 – 12/31/03  $00.08; 1/1/04-12/31/05 $00.085.

EMI has never received any payment from HFA for any of the unauthorized uses during the period covered by this litigation. Karen's habitual delinquency should give it no protection from EMI's copyright infringement claims.

## VI. CONCLUSION

62. As set forth above, HFA records conclusively show that no licenses were issued for the use of any of the Compositions in the Infringing Recordings, that Defendants' payments for the unauthorized uses were insufficient and inadequate, and that Defendants were well aware that they could not get licenses due to the ongoing License Hold resulting from their prior failure to pay royalties. Summary judgment granting EMI's four counts of willful copyright infringement should be granted in all respects.

Dated: March 14, 2008
New York, New York

*Christos P. Badavas*
CHRISTOS P. BADAVAS