UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EMI ENTERTAINMENT WORLD, INC.,

                Plaintiff,

- against -

KAREN RECORDS, INC., ET AL.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

1:05-cv-00390-RJH-JCF

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

      This case arises out of a long-running royalty dispute between Karen Records, Inc. ("Karen"), a Latin record company, and the Harry Fox Agency ("Harry Fox"), the mechanical licensing clearinghouse. It raises interesting questions about the Copyright Act's compulsory mechanical licensing scheme for nondramatic musical works.

      For many years, Karen and Harry Fox have disputed the amount of royalties that Karen owes music publishers represented by Harry Fox. In this action, one such publisher, EMI Entertainment World, Inc. ("EMI"), claims that Karen infringed its copyrights because Karen never acquired mechanical licenses for four songs it included on compilation albums. While the lawsuit is brought in EMI's name, Harry Fox is the driving force behind it.

      The parties' dispute focuses on the scope of Karen's authorization to use EMI's compositions. In particular, the parties disagree about whether Karen acquired mechanical licenses to EMI's compositions, and the scope of the protection afforded by those licenses. Both Karen and EMI have moved for summary judgment. For the reasons that follow, the parties' motions are granted in part and denied in part.

**I.    BACKGROUND**

**A.    The Parties and Compositions in Suit**

Karen, the defendant, is a record company and "the home of the best merengues, bachatas and sones." (Karen Music, http://www.karenmusic.net/ingles/index.htm (last visited Mar. 19, 2009).) Harry Fox is a mechanical licensing agency for music publishers, which describes itself as "a 'one stop shop' for most mechanical licensing in the United States." (Badavas Decl. ¶ 6.) Plaintiff EMI is a music publisher that Harry Fox represents. (*Id.* ¶ 4-5.)

The parties have a long history of disputes, but this case concerns four specific compositions: (i) *La Colegiala* by Grover Walter Leon Aguilar; (ii) *Corazón Partío* by Alejandro Sanz; (iii) *Cuando Acaba el Placer* by Nacho Mano; and (iv) *Fuiste Mia un Verano* by Leonardo Favio and Vico Berti. (Badavas Decl. ¶ 18.) As the case turns on Karen's obligations under the compulsory licensing system for nondramatic musical works established in § 115 of the Copyright Act, 17 U.S.C. § 115 (2006), the Court begins with a brief description of that system.

**B.    Compulsory Mechanical Licensing and the Harry Fox Agency**

Under § 115, a nondramatic musical composition (i.e., a song's words and music) that has been reproduced in phonorecords with the permission of the copyright owner may be reproduced in phonorecords by another person, if that person notifies the copyright owner and pays a royalty fixed by law. *See* 17 U.S.C. § 115; Notes of Committee on the Judiciary, H.R. Rep. 94-1476 (Sept. 3, 1976), *as reprinted in* 17

U.S.C.A. § 115, at 472 (2005).[1]  Section 115's precursor allowed the act of "mechanically" recording a song on media such as phonographic records or piano rolls. (3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.04[A], at 8-58-4 (2008) ("*Nimmer*").)  Thus for purely historical reasons a license acquired under § 115 is referred to as "mechanical" license.  (*Id.*)

By regulation, the current royalty for a mechanical license is the greater of (i) 9.1 cents per track or (ii) 1.75 cents per partial minute of a track's playing time.  37 C.F.R. § 255.3 (2008).  As a result, a record company that wants to produce a compilation CD with twelve tracks on it can expect to pay about a dollar per CD for mechanical licenses (12 x $.091 = $1.092), unless it can negotiate better rates with the entities that hold the copyrights to the compositions included on the CD.  Section 115(c)(3)(B) of the Copyright Act expressly contemplates such private negotiation, and exempts license clearinghouses from the antitrust laws.[2]

To obtain a mechanical license, a licensee must follow the procedure specified in § 115(b).  The essential requirement is that the licensee serve notice of its intent to make use of the composition on the copyright owner.  Such notice must be served before, or within thirty days after, the licensee makes phonorecords of the composition.  § 115(b). In addition, the notice must be served before distribution of the phonorecords begins.  *Id.*

---

[1] "Phonorecord" is the Copyright Act's generic term for objects like CDs or records that sounds are fixed in.  17 U.S.C. § 101.

[2] In part, this provision provides:

> Notwithstanding any provision of the antitrust laws, any copyright owners of nondramatic musical works and any persons entitled to obtain a compulsory license under subsection (a)(1) may negotiate and agree upon the terms and rates of royalty payments under this section and the proportionate division of fees paid among copyright owners, and may designate common agents on a nonexclusive basis to negotiate, agree to, pay or receive such royalty payments.

An implementing regulation, 37 C.F.R. § 201.18, specifies the form, content, and manner of service for the notice. For example, the notice must have a title that only a lawyer could love, "Notice of Intention to Obtain a Compulsory License for Making and Distributing Phonorecords." § 201.18(c)(1). It must contain a "clear statement," § 201.18(c)(2), identifying the licensee, the musical composition for which a license is sought, and the phonorecords that will be made and distributed. And the notice must be signed by the licensee. *See* § 201.18(d).

These requirements need not be followed with Prussian rigidity, however. Under § 201.18(g), "[h]armless errors in a Notice that do not materially affect the adequacy of the information required to serve the purposes of [§ 115(b)] shall not render the Notice invalid." Thus, if the purposes of § 115(b) are served, technical noncompliance with 37 C.F.R. § 201.18 does not prevent a licensee from acquiring a compulsory mechanical license.

Once a license is issued, the licensee must make monthly royalty payments to the copyright holder. *See* 17 U.S.C. §§ 115(c)(2), 115(c)(5). A licensee's failure to pay royalties, however, does not result in her license terminating automatically. Instead, § 115 puts the burden on the copyright owner to "give written notice to the licensee that, unless the [licensee's] default is remedied within thirty days from the date of [notice of default], the compulsory license will be automatically terminated." § 115(c)(6). Once a rightsholder terminates a license, the licensee becomes liable for all production or distribution for which it did not pay a statutory royalty. In the words of the statute, "termination renders either the making or the distribution, or both, of all phonorecords for which the royalty has not been paid, actionable as acts of infringement under section 501

and fully subject to the remedies provided by sections 502 through 506 and 509."
§ 115(c)(6).

In practice, questions about how § 115(b) operates are largely academic. Most record companies do not make use of the process outlined therein, but acquire licenses from Harry Fox, which is authorized to issue mechanical licenses on behalf of the major U.S. music publishers. (*See* Badavas Decl. ¶ 6.) Licenses issued by Harry Fox do not, however, alter the basic rights and obligations of the licensee under § 115. (*See id.* ¶ 7.) Thus, the net effect Harry Fox's involvement in the licensing process is to streamline the procedures created by §§ 115(b) and 115(c), with the statute acting as a "ceiling" on the price a copyright owner may charge for a mechanical license. (*Nimmer*, § 8.04[I], at 8-81 to 8-82.)

C.   **The Present Dispute**

This lawsuit concerns Karen's obligations to pay statutory royalties for three CDs it released between 1999 and 2001.

In the summer of 1999, Karen developed plans to release CDs entitled *Mas Romantico* and *Bomba 2000*. (*See* Rodriguez Aff. ¶¶ 24, 43.) On July 6, 1999, Karen faxed preprinted forms to Harry Fox requesting licenses for two songs it intended to include on *Mas Romantico*—*Cuando Acaba el Placer* and *Corazón Partío*. (*See* Rodriguez Aff. Ex. E.)[3] The forms listed Karen's name and contact information, the

---

[3] *Cuando Acaba el Placer* [*When Pleasure Ends*] tells the story of a rejected lover who cannot forget his past love. *Corazón Partío* [*Broken Heart*] recounts a similar story, culminating in the chorus, "¿Quién me va a entregar sus emociones? / ¿quién me va a pedir que nunca le abandone? / ¿quién me tapara esta noche si hace frío? / ¿quién me va a curar el corazón partío?" ["Who will give me her emotions? / Who's going to ask me to never abandon her? / Who will warm me if the night is cold? / Who will heal my broken heart?"]. (*See, e.g.*, Alexandre Pires, *Cuando Acaba el Placer*, on Exitos: Solo Para

- 5 -

names and authors of the compositions for which Karen sought licenses, and the publishers that owned the rights to those compositions. (*Id.*) The forms further indicated that the songs would be included on *Mas Romantico*. (*Id.*) In the forms' "explanation" fields, someone wrote, "Please issue and release license from 7/6/99." (*Id.*) According to a certificate of registration filed with the Copyright Office, Karen released *Mas Romantico* on September 21, 1999. (Rodriguez Aff. Ex. F.)[4]

On October 2, 1999, Karen sent an identical form to Harry Fox requesting a license for *Fuiste Mia un Verano*, which Karen intended to include on *Bomba 2000*. (*See* Rodriguez Aff. Ex. J.)[5] Confusingly, this form also read, "Please issue and release license from 7/6/99." (*Id.*) Karen first released *Bomba 2000* on October 30, 1999. (Rodriguez Aff. Ex. K.) It re-released the album a year later, on October 30, 2000. (Rodriguez Aff. Ex. F.)

In the fall of 2001, Karen developed plans to release an album called *Grandes Exitos de Alex Bueno en Bachata* ("*Grandes Exitos*"). (*See* Rodriguez Aff. ¶¶ 48-49.) In connection with the album, Karen sent a fax to EMI requesting a mechanical license for

---

Usted (Sony International 2007); Alejandro Sanz, *Corazón Partío*, on Más (WEA Latina 1997).)

[4] EMI claims that *Mas Romantico* was released in July 1999, but the only evidence it cites is a photocopy of the album's artwork dated May 21, 2007. (*See* Bernstein Decl. Ex. I.) Since a certificate of registration constitutes prima facie evidence of the facts stated therein, 17 U.S.C. § 410(c), the Court finds that *Mas Romantico* was released on September 21, 1999.

[5] As its title suggests, *Fuiste Mia un Verano* [*You Were Mine One Summer*] tells the story of a summer love affair. As in *Cuando Acaba el Placer* and *Corazón Partío*, the singer cannot put the memory of his lost love behind him. (*See, e.g.*, Leonardo Favio, *Fuiste Mia un Verano*, on 30 Exitos (Codisco 2007).)

*La Colegiala* on November 15, 2001.  (*See* Rodriguez Aff. Ex. N.)[6]  Eleven days later, an EMI employee named Frank Mercado sent a fax to Harry Fox.  In part, it read:

> Following please find a license request rate sheet issued for the above mentioned album [*Grandes Exitos*].  Kindly have a license issued for each title listed and sent to the attention of Ingrid Rodgers at Karen Records for counter-signature.  Please do not place [the] licenses in to [sic] Pending.

(Rodriguez Aff. Ex. O.)  The record contains no evidence that Karen received a copy of this fax.

The next day, November 16, 2001, Karen faxed a form to Harry Fox requesting a license for *La Colegiala*.  (Rodriguez Aff. Ex. M.)  Three features of this form distinguish it from the other forms that Karen sent to Harry Fox.  First, the form was entitled "Request for Mechanical License."  Second, it contained a line for "publisher[']s approval" that Harry Fox never countersigned.  And third, the form did not contain the other forms' "Please issue and release…" language.  *Grandes Exitos* was released on November 30, 2001.  (Rodriguez Aff. ¶ 52.)

Throughout this entire period, Karen and Harry Fox were engaged in disputes over Karen's prior royalty payments. (*See* Badavas Decl. ¶¶ 26-28, 30-33, 36-39, 45, 47-49, 51.)  In September 1997—two years before the release of *Mas Romantico* and *Bomba 2000*—Harry Fox sent Karen a letter terminating its licenses for a number of phonorecords not at issue here.  (Badavas Decl. Ex. O.)  Eight months later, two copyright owners who are not a party to this action initiated a copyright infringement action against Karen.  (*See* Compl., *Nicolosi v. Karen Publishing Co.*, No 98 Civ. 3843

---

[6] In this standby, the singer attempts to attract the attention of a pretty college student. (*See* Let's Sing It, La Colegiala Lyrics, http://artists.letssingit.com/gary-low-lyrics-la-colegiala-6l4zj1g (last visited Mar. 19, 2009).)

- 7 -

(WHP) (S.D.N.Y. May 29, 1998).)  As part of an agreement settling that action, Karen permitted Harry Fox to audit its books and records.  (Badavas Decl. ¶ 29.)

Harry Fox conducted the audit in early 1999.  (*See* Badavas Ex. P.)  On March 13, 1999, its accountants, Prager & Fenton, issued a report concluding that Karen owed $501,362.44 to publishers represented by Harry Fox for the period between January 1, 1992 and December 31, 1998.  (*Id.* at 1.)  Accountants retained by Karen disputed this conclusion.  (Badavas Decl. Ex. Q.)

After more back-and-forth between Karen and Harry Fox, EMI and another publisher, Peer International Corp., initiated a second copyright infringement action against Karen on June 21, 2000.  (*See* Compl., *Peer Int'l Corp. v. Karen Publ'g Co.*, No. 00 Civ. 4599 (LAP) (S.D.N.Y. June 21, 2000).)  In April 2001, the parties settled that lawsuit.  (*See* Badavas Decl. Ex. Z.)  The settlement agreement provided that certain licenses previously issued and revoked by Harry Fox "shall be deemed restored to operation and be and become binding on Karen Publishing Company and the Plaintiffs . . . ." (*Id.* at 5, ¶ 3.)  However, the plaintiffs reserved their right to terminate and revoke these licenses if Karen failed to pay royalties in the future.  (*Id.*)  Meanwhile, Karen and Harry Fox continued to negotiate over the amount of royalties Karen owed for January 1, 1992 through December 31, 1998.  (*See* Badavas Decl. ¶¶ 47-49, 51.)  They did not, however, ever reach agreement.

Events came to a head in the fall of 2004.  On October 26, 2004, Harry Fox sent Karen a letter complaining that Karen had failed to pay royalties for a number of compositions, including the four compositions at issue in this case.  (Badavas Decl. Ex. HH, at 1 & Schedule A, at 1, 3.)  The letter also notified Karen pursuant to § 115 that

Harry Fox was terminating Karen's licenses to these compositions. (*Id.*, at 1.) There is no evidence that Karen remedied the defaults mentioned in this letter.

On January 14, 2005, EMI initiated this lawsuit. After recounting the history of Harry Fox's relationship with Karen, EMI's complaint alleged that (i) Harry Fox had refused to grant Karen a licenses for *La Colegiala*, *Corazón Partío*, *Cuando Acaba el Placer*, and *Fuiste Mia un Verano* (Compl. ¶ 27 & Schedule A); (ii) Karen had failed to resolve its royalty payment defaults (*id.* ¶ 28); and (iii) Karen nevertheless continued to manufacture and distribute recordings embodying those compositions (*id.* ¶ 31).

In March and April 2008, the parties moved for summary judgment. In its motion, EMI argues that because Harry Fox terminated all of Karen's licenses issued to Karen in its September 1997 letter, Karen's use of the compositions was unauthorized. (Pl.'s Opening Mem. 8.) EMI further argues that nothing in the record supports a finding that EMI issued implied licenses to Karen. (Pl.'s Reply Mem. 5-6, 8.) For its part, Karen maintains that EMI's action is untimely, or barred by the doctrines of laches, waiver, and estoppel. (Def.'s Opp. Mem. 3-10.) Karen argues that in any event, it acquired valid mechanical licenses for the four compositions at issue. (*Id.* at 13-14.) In its cross motion, Karen moves to dismiss the complaint in its entirety.

## II.      DISCUSSION

Both parties' motions raise the question of whether Karen ever acquired mechanical licenses for *La Colegiala*, *Corazón Partío*, *Cuando Acaba el Placer*, and *Fuiste Mia un Verano*, and if so, what sales those licenses covered. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "An interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages."  Fed R. Civ. P. 56(d)(2).

**A.      *Cuando Acaba el Placer*, *Corazón Partío*, and *Fuiste Mia un Verano***

With respect to *Cuando Acaba el Placer*, *Corazón Partío*, and *Fuiste Mia un Verano*, the Court concludes that Karen acquired mechanical licenses in its communications with Harry Fox in July and October 1999, which terminated on November 25, 2004.  As a result of the termination, Karen is retroactively liable for any sales of those compositions that occurred within the limitations period for which it did not pay a statutory royalty.

*1.  Acquisition*

First, acquisition.  As suggested above, *see supra* pp. 5-6, Karen's communications with Harry Fox in July and October 1999 substantially complied with the requirements of 17 U.S.C. § 115(b) and 37 C.F.R. § 201.18.  Karen therefore acquired mechanical licenses to *Cuando Acaba el Placer*, *Corazón Partío*, and *Fuiste Mia un Verano* by operation of law.

True, Karen's form requests did not comply with § 201.18's requirements to the letter.  They were not, for example, signed by "a duly authorized officer or agent of the corporation," § 201.18(e)(1), nor were they entitled "Notice of Intention to Obtain a Compulsory License for Making and Distributing Phonorecords," § 201.18(d).  But as already noted, such errors are not fatal to a notice unless they "materially affect[ed] the adequacy of the information required to serve the purposes of [17 U.S.C. § 115(b)]." 37 C.F.R. § 201.18(g).  Karen's notices clearly indicated its intent to acquire mechanical licenses to EMI's works, specifically identified the compositions it sought licenses for (as

- 10 -

well as the albums those compositions would appear on), and identified Karen with enough specificity for EMI to easily enforce its rights (witness this suit).  The purposes of § 115(b) were served.

EMI's only objection to this conclusion is that Harry Fox precluded Karen from acquiring mechanical licenses for its compositions in the letter it sent in September 1997. (*See* Pl.'s Opening Mem. 7-8; Badavas Decl. Ex. O.)  In particular, EMI argues on the basis of the September 1997 letter that Harry Fox "imposed a 'license hold' on the Karen account *so that no new licenses could be issued*."  (Pl.'s Opening Mem. 8 (emphasis added).)  This argument is flawed as a matter of law and fact.

To begin with, there is some question whether a copyright owner may prospectively withhold mechanical licenses based on a licensee's past failure to pay royalties.  In *Peer International*, for instance, the Ninth Circuit noted that the plaintiffs before it could not prevent the defendants from obtaining licenses to works not subject to an earlier revocation, "[b]ecause the plaintiffs' copyrighted works are governed by the compulsory licensing provisions of section 115(c) . . . ."  909 F.2d at 1334.

The Court need not address the general question of whether a copyright owner can prospectively prohibit a licensee from taking advantage of § 115(b), however, because Harry Fox's September 1997 letter does not show nearly as much as EMI claims. The letter does not indicate that a "license hold" has been placed on Karen's account; and it only purports to terminate "the aforesaid licenses with respect to the phonorecords set forth in such schedules."  (Badavas Decl. Ex. O, at 1.)  Thus, even assuming a copyright owner or its agent may prospectively place a "hold" on a licensee's ability to obtain

mechanical licenses under § 115—a position for which there is little support in the statutory text—Harry Fox's letter failed to do so.

EMI does not raise the point, but it might also be argued that Karen could not acquire a mechanical license from Harry Fox, because *EMI* controlled the copyrights at issue. *See* 17 U.S.C. § 115(b) ("Any person who wishes to obtain a compulsory license under this section shall . . . serve notice of intention to do so *on the copyright owner*." (emphasis added)). This distinction makes no difference, however, because Harry Fox acted as EMI's licensing agent at all relevant times. (*See, e.g.*, Badavas Decl. ¶ 1 ("Although HFA is not a party to this action, it has acted as EMI's authorized agent at all times relevant hereto."); *id.* ¶ 6 ("HFA serves as a 'one stop shop' for most mechanical licensing in the United States; it collects and distributes royalties to its publisher-principals for the sale of licensed recordings.")). Under basic principles of agency law, Karen's notice of intent was effective as to EMI. *See* Restatement (Third) of Agency, § 5.02 (2006) ("A notification given to an agent is effective as notice to the principal if the agent has actual or apparent authority to receive the notification . . . ."); § 5.03 ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal . . . .").

*2. Termination*

The next question is the scope of the licenses Karen acquired. As noted, § 115(c)(6) provides that if a licensee fails to pay statutory royalties, the copyright owner may terminate the licensee's license by providing thirty days notice of its intent to do so. Here, the clock started running with Harry Fox's October 26, 2004 letter, which expressly notified Karen that (i) it was in default on its royalty payments and (ii) Harry Fox was

- 12 -

terminating the licenses at issue in this lawsuit.  (Badavas Decl. Ex. HH, at 1.)  There is no evidence that Karen attempted to cure its defaults within the thirty days following EMI's letter.  Thus, Karen's licenses to *Cuando Acaba el Placer*, *Corazón Partío*, and *Fuiste Mia un Verano* terminated on November 25, 2004.

The effect of this termination is specified by statute: the termination "render[ed] either the making or the distribution, or both, of all phonorecords for which the royalty has not been paid, actionable as acts of infringement."  § 115(c)(6).  Accordingly, with respect to these three compositions, Karen is liable as an infringer for all sales that occurred within the limitations period for which it did not pay Harry Fox or EMI a statutory royalty.

**B.** *La Colegiala*

The Court next turns to *La Colegiala*.  The form Karen faxed to Harry Fox for this song differed in important ways from the forms it sent to Harry Fox for *Cuando Acaba el Placer*, *Corazón Partío*, and *Fuiste Mia un Verano*.  Unlike the earlier forms, the *La Colegiala* form explicitly *requested* a license.  Furthermore, it did not contain the earlier forms' "Please issue and release…" language, and thus never expressed a clear intent to make use of *La Colegiala*.  The Court concludes that as a result of these differences, Karen never acquired a license for this composition.

Karen does not contest this point.  But it argues, citing Frank Mercado's fax to Harry Fox, that EMI is estopped from asserting that a license never issued.  This argument is unavailing, since there is no evidence that Karen received EMI's fax before this litigation.  Reliance, which is an element of estoppel, presupposes knowledge.  *Lottie*

*Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F. Supp. 531, 535 (S.D.N.Y. 1977) (Cannella, J.), *aff'd* 592 F.2d 651 (2d Cir. 1978).

Section 106 of the Copyright Act grants a copyright owner the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending," or to "authorize" a third party to do so. 17 U.S.C. § 106(3). And § 501 provides that "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an infringer of the copyright or right of the author, as the case may be." 17 U.S.C. § 501(a). Since Karen never acquired a valid license to *La Colegiala*, any sales of that composition which occurred within the limitations period infringed EMI's copyright.

**C.     Karen's Remaining Defenses**

With this understanding of the scope of Karen's licenses in mind, the Court turns to Karen's remaining defenses.

*1.  Statute of Limitations*

First, Karen contends that the statute of limitations bars EMI's action in all respects. (Def.'s Opp. Mem. 6-7.) Specifically, Karen contends that because EMI was aware that *Mas Romantico*, *Bomba 2000*, and *Grandes Exitos* made use of its compositions, EMI's cause of action accrued when those albums were released in 1999 and 2001. In addition, Karen contends that there is "absolutely no evidence to suggest that Karen had re-released or redistributed the Subject Recording within three years of the filing of the Complaint." (Def.'s Opp. Mem. 6.)

These arguments rest on misunderstandings of law and fact. Under § 507(b) of the Copyright Act, an action for infringement must be brought "within three years after the claim accrued." While courts in this Circuit do not apply the "continuing wrong"

theory associated with *Taylor v. Meirick*, 712 F.2d 1112 (7th Cir. 1983), they do recognize that "[e]ach act of infringement is a distinct harm giving rise to an independent claim for relief." *Stone v. Williams*, 970 F.2d 1043, 1050 (2d Cir. 1992); *see, e.g.*, *Auscape Int'l v. Nat'l Geographic Soc'y,* 409 F. Supp. 2d 235, 241 (S.D.N.Y. 2004) (Kaplan, J.).  It follows that while Karen is not liable for its initial release of *Mas Romantico*, *Bomba 2000*, and *Grandes Exitos*, it is liable for sales of those albums that occurred during the limitations period.

Furthermore, the record does contain evidence that such sales occurred.  In particular, the record contains an accounting produced by Karen which shows that Karen received revenue for three of the four compositions at issue in this lawsuit through 2005. (*See* Badavas Decl., Ex. JJ. at 76-77 (noting first quarter 2005 sales of *Cuando Acaba el Placer*, *Corazón Partío*, and *La Colegiala*).)  Karen has introduced no evidence that this revenue was anything but the result of direct sales.  Thus, the Court rejects Karen's argument that the statute of limitations bars EMI's action *in toto*.

2. *Waiver*

Karen next argues that EMI has waived any infringement claim against it based on the four compositions in suit, because EMI (i) initiated and settled another lawsuit against Karen involving a different version of *La Colegiala*, and (ii) accepted royalties for *Mas Romantico* in 2001 after consulting with counsel.  (*See* Def.'s Opp. Mem. 8-10.) The defense of waiver generally requires a showing that the plaintiff intentionally relinquished a known right.  *See Capitol Records, Inc. v. Naxos of Am., Inc.*, 372 F.3d 471, 482 (2d Cir. 2004) ("[A] claim of waiver requires proof of an 'intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it.'" (applying New York law)).  Nothing in the agreement settling the earlier

litigations shows that EMI intended to relinquish its right to sue Karen in the future.  (*Cf.* Badavas Decl. Ex. Z, at 5 (reserving EMI's rights in the event of continued accounting defaults).)  And of course, EMI's acceptance of checks in 2001 did not waive its right to sue for infringement that did not occur until three years later.  The Court rejects Karen's waiver defense.

        *3.  Laches*

Lastly, Karen argues that EMI's action is barred by laches, since "[EMI] delayed six years from the date it received notice of Karen's intent to use the first two subject compositions and the request for license to object to or 'deny' the license."  (Def.'s Opp. Mem. 7.)  Assuming the defense is available in copyright infringement actions, *see Zitz v. Pereira*, 119 F. Supp. 2d 133, 142 (E.D.N.Y. 1999) (Boyle, M.J.), EMI did not unreasonably delay initiating this lawsuit.  The record shows a history of on-again, off-again negotiations between Karen and Harry Fox that lasted from 1997 until 2005.  (*See, e.g.*, Badavas Decl. ¶¶ 30, 51, 60.)  Given the cost of litigation in the federal courts, seeking a negotiated solution before filing suit is far from unreasonable.  *Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I, LLC*, 582 F. Supp. 2d 616, 634 (S.D.N.Y. 2008) (Holwell, J.).

**D.**     **Damages**

Arguing that Karen's infringement of its copyrights was willful, EMI requests statutory damages of $150,000 for each act of infringement that occurred within the limitations period.  In addition, EMI seeks to hold Bienvenido Rodriguez and Isabel Rodriguez, Karen's two principals, personally liable for any infringement committed by Karen.  The current record, however, does not indicate with any certainty how many infringing sales occurred during the periods the Court has identified.  In view of the

- 17 -

settled principle that "statutory damages cannot be divorced entirely from economic reality," *Yurman Studio, Inc. v. Castaneda*, No. 07 Civ. 1241 (SAS), 2008 WL 4949775, at *3 (S.D.N.Y. Nov. 19, 2008) (Scheindlin, J.), the Court directs the parties to make supplemental submissions addressing the actual number of infringing sales that occurred within the periods the Court has identified.  If the parties' submissions show continuing, genuine factual disputes as to this issue, the Court will set the case for trial; if not, summary judgment will be entered.

### III. CONCLUSION

For the reasons stated above and pursuant to Federal Rule of Civil Procedure 56(d)(1), the Court concludes that:

(i) Karen acquired mechanical licenses for *Cuando Acaba el Placer*, *Corazón Partío*, and *Fuiste Mia un Verano* that lasted until November 25, 2004;

(ii) Karen never acquired a mechanical license for *La Colegiala*;

(iii) Sales of *Mas Romantico* and *Bomba 2000* that occurred on or after January 14, 2002, infringed EMI's copyrights, provided that Karen did not pay EMI or Harry Fox a statutory royalty for those sales; and

(iv) All sales of *Grandes Exitos* that occurred on or after January 14, 2002, infringed EMI's copyrights.

The parties' motions for summary judgment **[54] [66]** are granted in part and denied in part. The parties are directed to confer and submit a proposed schedule for further submissions by April 17, 2009.

SO ORDERED.

Dated: New York, New York
       March 27, 2009

Richard J. Holwell
United States District Judge

- 18 -