UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
EMI ENTERTAINMENT WORLD, INC.,     :     05 Civ. 390 (RJH)(JCV)
            :
          Plaintiff,     :
            :
     v.     :   **MEMORANDUM OPINION**
            :     **AND ORDER**
KAREN RECORDS, INC., KAREN     :
PUBLISHING INC., BIENVENIDO     :
RODRIGUEZ, ISABEL RODRIGUEZ AND     :
FIDEL HERNANDEZ,     :
            :
          Defendants.     :
-------------------------------------------------------------x

Richard J. Holwell, District Judge:

      The Court has granted partial summary judgment to plaintiff EMI Entertainment World,

Inc. ("EMI") in this copyright infringement action. *See EMI Entm't World, Inc. v. Karen*

*Records, Inc.*, 603 F. Supp. 2d 759 (S.D.N.Y. 2009) ("*EMI I*").  The Court granted summary

judgment with respect to EMI's claims that certain sales on or after January 14, 2002 by

defendants Karen Records, Inc. and Karen Publishing, Inc., (together, the "Karen Defendants")

of albums containing four musical compositions infringed EMI's copyrights in those

compositions.  *See id.* at 770.  In connection with EMI's request for statutory damages, the Court

directed the parties to make "supplemental submissions addressing the actual number of

infringing sales that occurred" on or after January 14, 2002.  *Id.*  For the following reasons, the

Court finds that Defendants willfully infringed EMI's copyrights in the four musical

compositions at issue and awards EMI $25,000 for infringement of each composition for which

all defendants shall be jointly and severally liable.

**BACKGROUND**

The background of this action is set forth in detail in *EMI I*, familiarity with which is presumed.

EMI is a music publisher that owns copyrights in the four musical compositions at issue here: *Cuando Acaba el Placer*, *Corazón Partío*, *Fuiste Mia un Verano*, and *La Colegiala*. EMI obtains royalty payments through the Harry Fox Agency ("HFA") for those compositions and others whose copyrights it owns. The Karen Defendants are record companies owned by individual defendants Isabel Rodriguez and her husband Bienvenido Rodriguez (together with the Karen Defendants, "Defendants") that released records between 1999 and 2001 containing the four compositions at issue.

Those releases were not the beginning of the parties' dispute regarding royalty payments pursuant to the compulsory license system of the Copyright Act. As early as September 1997, HFA sent the Karen Defendants a letter terminating its compulsory licenses for compositions not at issue here. Less than a year later, other copyright owners brought suit against the Karen Defendants for copyright infringement based on unpaid royalties. *See Nicolosi v. Karen Publ'g Co.*, No. 98 Civ. 3843 (WHP) (S.D.N.Y.). As part of a settlement of that suit, HFA audited the Karen Defendants' books and concluded that the Karen Defendants owed HFA-represented publishers over $500,000 in unpaid royalties. In 2000, based on that audit, EMI and Peer International Corp., another music publisher, brought suit against the Karen Defendants for copyright infringement based on unpaid royalties. *See Peer Int'l Corp. v. Karen Publ'g Co.*, No. 00 Civ. 4599 (LAP) (S.D.N.Y.). The parties reached a settlement of that suit but were unable to reach agreement on the amount of unpaid royalties owed by the Karen Defendants.

On October 26, 2004, HFA sent the Karen Defendants a letter complaining that the Karen Defendants continued to owe royalties for numerous compositions, including the four compositions at issue here.  (*See* Dec. of C. Badavas, Mar. 14, 2008 ("Badavas Dec."), Ex. HH (the "October 26 Letter").)  The letter indicated that, unless the Karen Defendants cured these deficiencies within 30 days, their licenses for the compositions would be terminated.

EMI filed this suit on January 14, 2005.  Following discovery, in March and April of 2008 the parties filed cross-motions for summary judgment.  In *EMI I*, the Court granted summary judgment with respect to EMI's claims that (a) EMI terminated the Karen Defendants' compulsory licenses to *Cuando Acaba el Placer*, *Corazón Partío*, and *Fuiste Mia un Verano* (the "Licensed Compositions"); and (b) that the Karen Defendants never obtained a license to *La Colegiala*.  Under the Copyright Act, "[s]uch termination renders either the making or the distribution, or both, of all phonorecords for which the royalty has not been paid, actionable as acts of infringement."  17 U.S.C. § 115(c)(6).  Accordingly, the Court held that all sales on or after January 14, 2002—the beginning of the statute of limitations period—of albums containing the Licensed Compositions "infringed EMI's copyrights, provided that Karen did not pay EMI or Harry Fox a statutory royalty for those sales."  *EMI I*, 603 F. Supp. 2d at 770.  In addition, the Court held that all sales on or after January 14, 2002 of an album containing *La Colegiala* "infringed EMI's copyrights."  *Id.*

However, the Court denied EMI's motion for summary judgment to the extent that EMI sought statutory damages for willful infringement.  Noting that "'statutory damages cannot be divorced from economic reality,'" but that "[t]he current record . . . does not indicate with any certainty how many infringing sales occurred during the periods the Court has identified," the Court directed the parties to make "supplemental submissions addressing the actual number of

infringing sales that occurred" on or after January 14, 2002.  *Id.* at 769-70 (quoting *Yurman Studio, Inc. v. Castaneda*, Nos. 07 Civ. 1241, 07 Civ. 7862, 2008 WL 4949775, at *3 (S.D.N.Y. Nov. 19, 2008)).

## LEGAL STANDARD

"Once an act of infringement under the Copyright Act has been proven, a plaintiff may, in lieu of an award of actual damages and profits, request that statutory damages under 17 U.S.C. § 504(c) be awarded." *Island Software and Comp. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 262 (2d Cir. 2005).[1]  "If the plaintiff so elects, the district court will grant anywhere between $750 and $30,000 for each copyright infringed." *Id.* at 262-63.  "If the defendant's infringement was willful, however, the district court may also, in its discretion, enhance the statutory damages award to as much as $150,000 per infringed work." *Id.* at 263.

The Copyright Act affords a trial court "wide discretion . . . in setting the amount of statutory damages." *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d 1110, 1116 (2d

---

[1] Section 504(c) provides in relevant part:

    **(1)** Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

    **(2)** In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200.

Cir. 1986).  In exercising its discretion, a trial court takes into account "the expenses saved and the profits reaped by the infringers"; "the revenues lost by the plaintiff"; "the value of the copyright"; "the potential for discouraging the defendant" and "the deterrent effect on others besides the defendant."  *Id.* at 1117.   In addition, "whether the defendant's conduct was innocent or willful" is also relevant, *see id.*, because statutory damages "serve the Copyright Act's twofold purpose of compensation and deterrence."  *RSO Records, Inc. v. Peri*, 596 F. Supp. 859, 862 (S.D.N.Y. 1984).

 "To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard for, or willful blindness to, the copyright holder's rights."  *Island Software and Comp. Serv., Inc.*, 413 F.3d at 263 (quotation marks omitted).  Thus, "a court need not find that an infringer acted maliciously to find willful infringement."  *Fitzgerald Pub. Co., Inc.*, 807 F.2d at 1115.  Rather, the Second Circuit "decisions clearly recognize that, even in the absence of evidence establishing the infringer's actually knowledge of infringement, a plaintiff can still prove willfulness by proffering circumstantial evidence that gives rise to an inference of willful conduct."  *Island Software and Comp. Serv., Inc.*, 413 F.3d at 264.  "Nevertheless, "at the summary judgment stage, although an inference of constructive knowledge or reckless conduct seems the better of the possible inferences that can be drawn," the court "must still draw all inferences in favor of the non-moving party."  *Id.*

### DISCUSSION

### A.  Infringement

 In *EMI I*, the Court granted summary judgment with respect to EMI's claims that the Karen Defendants' sales on or after January 14, 2002 of albums containing the four musical

compositions at issue infringed EMI's copyrights in those compositions.  *See* 603 F. Supp. 2d at

770.  The Court then requested "supplemental submissions addressing the actual number of

infringing sales that occurred" on or after January 14, 2002.  *See id.* at 769-770.  Since the Court

held that sales of albums containing the Licensed Compositions infringed EMI's copyrights

"provided that Karen did not pay EMI or Harry Fox a statutory royalty for those sales," *id.* at

770, *EMI I* arguably left open the possibility that Defendants could show either that (a) no sales

of albums containing the four compositions occurred or (b) that Karen paid EMI a royalty for all

sales of the Licensed Compositions.

Defendants have attempted to make the latter showing with respect to all four

compositions.  With respect to *La Colegiala*, Defendants' attempt is misplaced because the Court

has already held that Defendants never obtained a license to use that composition.  Accordingly,

"*[a]ll sales* of *Grandes Exitos* [an album containing *La Colegiala*] that occurred on or after

January 14, 2002, infringed EMI's copyrights."  *EMI I*, 603 F. Supp. 2d at 770.

With respect to the Licensed Compositions, the matter is somewhat more complicated.

Defendants argue that "[t]he only time period for which there can be any possible dispute is the

one year period between the [second] and [third] Quarter of 2002 and the [third] and [fourth]

quarter of 2003," what Defendants call the "Missing Payment Period."  (Defs.' Opp'n at 3.)

Defendants admit that they are "unable to locate copies of the Royalty checks paid for this

period."  (*Id.* at 2.)   Needless to say, EMI disputes Defendants' conclusion and points to a sworn

affidavit that EMI received no royalty payments after 2003.  (*See* Badavas Dec. ¶¶ 51, 54.)

However, no party submitted any invoices showing that any royalties were actually paid, even

though such invoices from as far back as 2004 were apparently available at the time that the parties briefed their summary judgment motions.  (*See id.* Ex. GG.)[2]

This state of the record is extremely disappointing given the Court's specific order that the parties provide "supplemental submissions addressing the actual number of infringing sales that occurred" after January 14, 2002.  *EMI I*, 603 F. Supp. 2d at 770.  Nevertheless, at a minimum, the record shows that sales of each of the Licensed Compositions were made in the Missing Payment period.  (*See* Dec. of R. Charap ("Charap Dec."), June 5, 2009, Ex. B.)  EMI has produced a sworn affidavit that no royalties were paid for these sales.  (*See* Badavas Dec. Ex. ¶¶ 51, 54.)  EMI could do little more to prove the negative, but Defendants have done nothing other than offer a conclusory denial that the royalties were never received.  On that record, the Court can only conclude that at least some sales of each of the Licensed Compositions occurred and that Defendants did not pay statutory royalties for those sales.  *Cf. Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) ("[M]ere conclusory allegations or denials in legal memoranda . . . are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist.") (quotation marks omitted).  Under the Copyright Act, those sales became acts of infringement when EMI terminated Defendants' licenses for the Licensed Compositions.  *Cf.* 17 U.S.C. § 115(c)(6).  In addition, data produced by Defendants themselves appears to suggest that that they paid royalties below the statutory rate following termination of the licenses for the Licensed Compositions.  Defendants do nothing to rebut that evidence.  Thus the sales for which Defendants paid these insufficient royalties, too, infringed EMI's copyrights.

The Court need not go further.  EMI has elected to pursue statutory damages.  Section "504(c)(1) disassociates the award of statutory damages from the number of infringements by

---

[2] Defendants cite to the "Caraballo Declaration," but that document was never served on EMI, provided to the Court, or docketed in the Electronic Court Filing ("ECF") system.

stating that 'an award' (singular tense) of statutory damages is available for 'all infringements involved in the action' regarding any one work." *WB Music Corp. v. RTV Commc'n Group, Inc.*, 445 F.3d 538, 540 (2d Cir. 2006). Hence "'the total number of awards of statutory damages that a plaintiff may recover in any given action depends on the number of works that are infringed and the number of individually liable infringers, regardless of the number of infringements of those works.'" *Id.* (quoting *Venegas-Hernandez v. Sonolux Records,* 370 F.3d 183, 192-93 (1st Cir. 2004)). Accordingly, for the purpose of determining statutory damages, it is sufficient to find that at least some infringing sales occurred within the statute of limitations period.

### B.  Willfulness

EMI requests the maximum statutory damages for willful infringement of $150,000 for each copyright infringed. EMI advances three reasons why Defendants acted willfully.

*First*, EMI argues that the individual defendants are "sophisticated business people, each with more than twenty-five years of experience in the recording and music publishing industry," who "own more than six hundred copyrighted sound recordings and musical compositions" and whose company, Karen, "even used HFA to issue mechanical licenses for some of its compositions to other record companies." (Pl's. Suppl. Br. at 2.) Defendants do not appear to dispute these facts. And other courts in this district have inferred willful infringement from a defendant's ownership of copyrights and experience in an industry heavily regulated by copyright law. *See, e.g.*, *Viacom, Int'l Inc. v. Fanzine Int'l, Inc.*, 98 Civ. 7448, 2001 WL 930248, at *4 (S.D.N.Y. Aug. 16, 2001) (finding willful infringement where defendant was "a multi-national publishing company that publishes over 200 magazine releases a year" and "[a]s such . . . is or should be familiar with copyright law and particularly with the general practices of securing permission before reproducing copyrighted works"); *Castle Rock Entm't v. Carol Pub.*

*Group*, 955 F. Supp. 260, 267 (S.D.N.Y. 1997) (Sotomayor, J.) (same where, *inter alia*, defendant's publisher "testified that his company has had experience with the copyright laws, and that he is familiar with the requirements of those laws"); *Peer Int'l Corp. v. Luna Records, Inc.*, 887 F. Supp. 560, 568 (S.D.N.Y. 1995) (Sotomayor, J.) ("Moreover, as an author of musical compositions himself and an experienced musical publisher for about 10 to 12 years, who distributed all the major labels of Spanish music, [defendant's] conduct in ignoring the revocation of [plaintiffs'] license demonstrates if not actual knowledge, reckless disregard for plaintiffs' copyrights.") (quotation marks omitted).

*Second*, EMI argues that its prior suit against Defendants for their alleged failure to pay royalties with respect to other copyrights not at issue here made Defendants "well aware of the obligations to obtain mechanical licenses and pay statutory license fees for the use of others' musical compositions. . . ."  (Pl.'s Suppl. Br. at 3.)   Defendants do not appear to dispute that they had been sued on several previous occasions, including once by EMI, regarding unpaid royalties.  What is more, they point out that Bienvenido was intimately involved with the settlement of EMI's 2000 lawsuit.  Indeed, Bienvenido acknowledged as much at his deposition. (Dec. of M. Bernstein, Mar. 14, 2008 ("Bernstein Dec."), Ex. V ("Bienvenido Tr.") at 24.)

Other courts in this district have found that a defendant whose practices have given rise to other copyright suits acts in reckless disregard of copyrights holders' rights when he continues them and merely instructs employees not to violate copyright law.  *See, e.g.*, *The Design Tex Group, Inc. v. U.S. Vinyl Mfg. Corp.*, 04 Civ. 5002, 2005 WL 2063819, at *3 (S.D.N.Y. Aug. 24, 2005) (noting that plaintiff's prior "lawsuit put [defendant] on clear notice of the risk of infringement involved in his company's practices"); *Viacom, Int'l Inc.*, 2001 WL 930248, at *4 (finding willful infringement where the defendant "has been sued at least two other times for

copyright infringement within a span of one year"); *Lauratex Textile Corp. v. Allton Knitting Mills Inc.*, 517 F. Supp. 900, 903-4 (S.D.N.Y. 1981) (where defendant, "through other of his corporations, has been a defendant to copyright infringement suits brought by converters ten times (including this action) in the last five years . . . . [t]he inference is inescapable that [defendant] has made a practice of copying the designs of other converters, and that an award of statutory damages is appropriate as a deterrent to further activity of this kind"). *Cf. Kenrbooke Fabrics, Inc. v. Holland Fabrics, Inc.*, 602 F. Supp. 151, 155 (S.D.N.Y. 1984) (awarding maximum statutory damages for willful infringement where defendant "and his corporate alter egos have been involved in a number of copyright infringement actions").

 *Third*, EMI argues that its October 26, 2004 letter placed Defendants "on notice that EMI, through HFA, never issued the requested licenses and/or that Defendants had defaulted on license fee payments. . . ."  (Pl.'s Suppl. Br. at 4.)  Defendants do not dispute having received the letter.  And other courts in this district have inferred willful infringement from the fact that a defendant engages in infringing activity after receiving a "specific warning" that the activity constitutes infringement.  *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1371 (2d Cir. 1993) (affirming finding of willful infringement where defendant "was threatened with a copyright action by Simon & Schuster, which holds certain book rights to the 'Twin Peaks' programs").  *See also, e.g.*, *Viacom, Int'l Inc.*, 2001 WL 930248, at *4 (finding willful infringement where "Fanzine continued to engage in infringing activities despite having been placed on notice of Viacom's objections."); *Castle Rock Entm't*, 955 F. Supp. at 267 ("Carol continued to publish and distribute [the infringing work] after receiving actual notice from plaintiff demanding that Carol cease and desist publication."); *Broadcast Music, Inc. v. R Bar of Manhattan, Inc.*, 919 F. Supp. 656, 660 (S.D.N.Y. 1995) (finding willful infringement where

plaintiff record companies' "representatives wrote to defendants on ten occasions and spoke with persons associated with the establishment's operation over 20 times").

Given that each of these acts from which courts have inferred willfulness —industry experience and copyright ownership; prior lawsuits regarding similar practices; and a specific warning—is present here, EMI has presented strong circumstantial evidence of willfulness.

This case, however, is exactly not on all fours with those cases because it involves the compulsory license system pursuant to 17 U.S.C. § 115.  The Court has already found that Karen acquired a compulsory license for *Cuando Acaba el Placer*, *Corazón Partío*, and *Fuiste Mia un Verano*.  *See EMI I*, 603 F. Supp. 2d at 766-67.  The October 26 Letter informed Karen that it had failed to pay the required statutory royalties, that failure to cure within 30 days would result in termination of the licenses, and that such termination would render Karen retroactively liable for sales for which it had not paid a royalty.   Indeed, "termination renders either the making or the distribution, or both, of all phonorecords for which the royalty has not been paid, actionable as acts of infringement. . . ."  17 U.S.C. § 115(c)(6).  However, retroactive infringement by operation of statute is one thing; retroactive intent is another.  Defendants' failure to cure their default within 30 days certainly transformed prior sales for which royalties had not been paid into infringing acts.  But did the October 26 Letter transform those sales into *willful* infringing acts even if the failure to pay royalties prior to the Letter had been inadvertent?

There are reasons to think not.  In the first place, drawing an inference of willful infringement from the failure to cure overdue royalty payments pursuant to a compulsory license would come close to transforming a breach of the compulsory license agreement into willful infringement *per se*.   A compulsory licensor could create an inference of willful infringement merely by providing sufficient notice of default pursuant to 17 U.S.C. § 115(c)(6).  But there is

no indication in the statute that Congress believed that statutory damages within the normal range would always be insufficient to remedy the failure to pay statutory royalties.  Nor is there any indication that Congress intended to absolve compulsory licensors of a copyright plaintiff's usual burden of proving willfulness.  Moreover, such a rule could create a perverse incentive to avoid the compulsory licensing scheme altogether.  If obtaining a license incurs a risk of enhanced statutory damages for not paying royalties, an infringer might well prefer to try convincing the court that the failure to participate in the licensing scheme shows just how much he or she was completely out to lunch.

Nevertheless, at least one court in this district has found willful infringement where "defendants received [a] notice terminating the licenses at issue unless [the defendant] paid its overdue royalties" but defendants "continued to make and distribute the previously licensed and unlicensed phonorecords, even some several months after [the] action as commenced."  *Peer Int'l Corp.*, 887 F. Supp. at 568.  Indeed, *Peer International* is closely on point, since that case involved a suit by EMI against a producer of Spanish-language records who had obtained through HFA compulsory licenses for musical compositions whose copyrights were owned by EMI but later failed to pay the required statutory royalties.   In finding that the defendants' infringement was willful, then Judge Sotomayor noted that (1) defendants had received two termination notices with respect to the compulsory licenses; and (2) that the principal defendant was "an author of musical compositions himself and an experienced musical publisher for about 10 to 12 years, who distributed all the major labels of Spanish music. . . ."  *Id.* (quotation marks omitted).  As noted above, that description could apply as well to Isabel and Bienvenido.  In those circumstances, Judge Sotomayor found that the defendants' "conduct in ignoring the

revocation of [their] license demonstrates if not actual knowledge, reckless disregard for plaintiffs' copyrights." *Id.*

Peer International suggests that the Court need not decide whether a notice terminating a compulsory license could transform the failure to pay royalties for prior sales into willful infringement. That is true for several reasons. First, the upshot of *Peer International* is that a termination notice does create an inference that post-termination sales are willful infringement. Hence the termination notice creates an inference that any sales between October 2004 and, at the least, January 14, 2005 when this lawsuit was filed were willful infringement. Second, because statutory damages are imposed on a per work basis, *see WB Music Corp.*, 445 F.3d at 540, the possibility that prior sales of a composition may not have been willful infringement does not negate the propriety of awarding enhanced damages for later willful infringement of the copyright in that composition. And third, it is unnecessary to decide whether a compulsory license itself could sustain a finding of willfulness where, as here and in *Peer International*, there is other circumstantial evidence of willfulness. Given Defendants' extensive experience in the record industry, their ownership of copyrights, and their settlement of EMI's prior lawsuit, the October 26 Letter was hardly the first Defendants had heard of problems with royalties for compositions whose copyrights were owned by EMI.

The strength of this circumstantial evidence distinguishes this case from *Island Software and Computer Service, Inc. v. Microsoft Corporation*, 413 F.3d 257 (2d Cir. 2005) in which the Second Circuit reversed a finding of willfulness. In that case, Microsoft proved that Island Software sold counterfeit software via a supplier, CCST. The trial court found that Island Software had willfully infringed based on three portions of an Island Software executive's testimony: (1) that the executive found CCST's pricing to be erratic; (2) that "an anonymous

customer called Island to complain about counterfeit merchandise"; and (3) "that Island did not take extensive measures to prevent the receipt and sale of high-quality counterfeit merchandise." *Id.* at 263. The Second Circuit reasoned that the pricing comments could indicate only that the executive "was frustrated with disruptions in his supply chain"; "that a reasonable merchant might not credit the claims of an anonymous customer"; and that "perhaps only an individual with specialized training . . . could discern the difference between authentic products and high-quality counterfeits" of the software at issue. *Id.* at 264. Since the Court was required to draw these inferences in favor of Island, the Court of Appeals held that the district court erred in granting summary judgment.

It is true that the *Island Software* court stated that summary judgment is inappropriate "even in a case . . . where the non-moving party does not traverse the evidence suggesting constructive knowledge of infringement, but only disputes the inferences to be drawn from the evidence. . . ." *Id.* at 264. But the inference of willfullness here is inescapable because the evidence is far clearer than the equivocal testimony before the court in *Island Software*. Defendants here had not received anonymous complaints; they had been sued several times by copyright holders and had been warned about another suit involving the same practices giving rise to the infringement that occurred here. Defendants here were not selling computer software whose complexity obfuscated the line between original and counterfeit; they were selling records that, as they knew from their own industry experience as copyright licensors, contained songs whose copyrights they did not own. And, tellingly, Defendants marshal virtually nothing in the way of alternative inferences from the circumstantial evidence other than to conclusively assert that EMI "submits absolutely no evidence to suggest that Karen acted willfully or that Karen needs to be deterred from similar conduct in the future." (Defs.' Br. at 6.) Yet a "litigant

opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 101 (2d Cir. 1997) (quotation marks omitted). Defendants have done no such thing.[3]   Accordingly, the Court grants summary judgment on EMI's claim that Defendants willfully infringed EMI's copyrights in the four musical compositions at issue.[4]

### C.  Amount of Damages

"When determining the amount of statutory damages to award for copyright infringement, courts consider:  (1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence

---

[3] In addition to the same conclusory arguments, Bienvenido relies on the settlement of EMI's prior lawsuit in arguing that "[a]ll defendants have been operating under the understanding since 2001 that all licenses were existing and in effect. . . ." (Dec. of D. Marotta at 7.)  Perhaps so, but such an understanding was no longer justified after Defendants received the October 26 Letter informing them that the licenses would be terminated.  From that time, Defendants were aware of a risk that their activities were infringing EMI's copyrights.  For that reason, this case is distinguishable from *GMA Accessories, Inc. v. Olivia Miller, Inc.*, 139 Fed. Appx. 301, 304 (2d Cir. 2005) in which the Second Circuit affirmed a finding of innocent infringement where a statement by plaintiff's representative "allowed [the defendant] to believe that 'the matter was minor and was being worked out.'"  *Id.* at 304.  Both the fact that settlement negotiations broke down and the October 26 Letter should have disabused Defendants of any similar belief.

[4] The Court notes that there is merit to EMI's contention that the Marotta Declaration on behalf of Bienvenido is procedurally defective because it lacks a date as required by 28 U.S.C. § 1746 and a memorandum of law as is generally required by the Local Rules of this Court.  *See* Local Civ. R. 7.1(a) ("Except as otherwise permitted by the court, all motions and all oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon in support of or in opposition to the motion, and divided, under appropriate headings, into as many parts as there are points to be determined.  Willful failure to comply with this rule may be deemed sufficient cause for the denial of a motion or for the granting of a motion by default.").   While the declaration does contain citations to legal authority and the Court's request for "submissions" did not specify the form such submissions should take, counsel for Mr. Bienvenido is advised to thoroughly consult the Local Rules of this Court in the future.

concerning the value of the infringing material; and (6) the conduct and attitude of the parties." *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010). That "the infringer's state of mind" is one factor suggests that these factors apply even where there is no genuine issue of material fact as to the defendant's willfulness. *See Yurman Studio, Inc.*, 2008 WL 4949775, at *3-*4 (assessing other factors after finding willfulness); *Peer Int'l Corp.*, 887 F. Supp. at 568 (listing other factors after finding willfulness).

Given that the Court has found that Defendants willfully infringed EMI's copyrights, the first factor, "the infringer's state of mind," militates in favor of an enhanced statutory award. However, the second and third factors, "the expenses saved, and profits earned" by Defendants and "the revenue lost by" EMI, point in the other direction. "Congress's decision to dramatically increase the cap on statutory damages reflected the increasing role of intellectual property in the American economy . . . but it does not require imposition of monumental statutory damages against smaller-scale or shorter-term willful infringers." *Yurman Studio, Inc.*, 2008 WL 4949775, at *3. Hence "statutory damages cannot be divorced from economic reality." *Id.* Rather, "[s]tatutory damages should bear some relationship to actual damages suffered." *Peer Int'l Corp.*, 887 F. Supp. at 568; *see also RSO Records*, 596 F. Supp. at 862. On the record before the court, those damages appear no more than several hundred dollars for any of the four compositions: $786.69 for *Cuando Acaba el Placer*, $524.90 for *La Colegiala*, $786.69 for *Corazón Partío*, and zero for *Fuiste Mia un Verano*, a figure that results from an excess of credits on unsold records returned by retailers over and above sales. (*See* Charap Dec. Ex. G.)

EMI argues that these data are not credible. There is some merit to that claim. As EMI points out, Defendants' figures list incorrect royalty rates, report sales of half albums, and indicate returns far in excess of sales for years at a time. All of that renders Defendants' figures

16

somewhat suspect.[5]  Moreover, EMI's sworn declaration offers unrebutted evidence that

Defendants provided complete sales figures only after EMI wrote to the Court regarding a

motion to compel Defendants to do so.   (*See* Charap Dec. ¶ 11.)  Defendants point the finger at

Universal, their distributor, and accuse EMI of failing to subpoena records from Universal.  But

the relevant consideration is "*the infringer's* cooperation in providing evidence concerning the

value of the infringing material."  *Bryant*, 603 F.3d at 144 (emphasis added).  Accordingly, the

Court finds that this factor buffets the level of statutory damages against the downward pressure

exerted by what appear on the present record to be minimal actual damages.

　　　　The fourth factor, deterrence, also points in favor of a higher award.  As set forth above,

Defendants have been sued for infringement numerous times for practices similar to those at

issue here.  Setting aside the effect of these multiple suits on willfulness *vel non*, this history

suggests that Defendants need to face consequences for their practices.  Only a significant award

could accomplish that objective.

　　　　What amount of statutory damages, then, would "serve the Copyright Act's twofold

purpose of compensation and deterrence," *RSO Records*, 596 F. Supp. at 862, while taking into

account both what appear to be minimal actual damages and Defendants' lack of cooperation in

providing more accurate figures?  In a similar situation, facing a "paucity of information" as to

actual damages, then Judge Sotomayor rejected EMI's request for the maximum amount of

damages for willful infringement on the ground that "[s]tatutory damages are not intended to

provide a plaintiff with a windfall recovery."  *Peer Int'l Corp.*, 887 F. Supp. at 568-69.  Instead,

---

[5] EMI also points to HFA's audit pursuant to the settlement of litigation against Defendants by
other copyright owners which revealed that Defendants had underreported sales and license fees
by over $500,000.  However, that audit concerned numerous musical compositions other than
those at issue here.  Accordingly, the audit is minimally relevant, if it is relevant at all.

Judge Sotomayor awarded $15,000 for the infringement of one composition and $25,000 for infringement of another. Given the need for deterrence and Defendants' lack of cooperation, the Court will award EMI $25,000 for infringement of each composition, for a total of $100,000. The Court finds that this award would be justified regardless of whether Defendants acted willfully. *See Island Software*, 413 F.3d at 265 (noting that "the court's reliance on a finding of willfulness was unnecessary to the relief it awarded" in the form of $30,000 in statutory damages for each work infringed); *Twin Peaks Prods.*, 996 F.2d 1366 (same with respect to award of $15,000 for each work infringed). *Cf.* 17 U.S.C. § 504(c) (providing for statutory damages "in a sum of not less than $750 or more than $30,000 *as the court considers just*") (emphasis added).

### D.  Individual Defendants' Joint and Several Liability

It remains to be determined whether Isabel and Bienvenido shall be jointly and severally liable for statutory damages. "All persons and corporations who participate in, exercise control over, *or* benefit from the infringement are jointly and severally liable as copyright infringers." *Sygma Photo News, Inc. v. High Soc. Magazine, Inc.*, 778 F.2d 89, 92 (2d Cir. 1985) (emphasis added). Hence "one may be vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). "Likewise a company president who supervises the selection, manufacture, distribution and sale of infringing recordings is jointly and severally liable for damages caused by the infringement." *Luft v. Crown Publishers, Inc.*, 772 F. Supp. 1378, 1379 (S.D.N.Y. 1991); *see also Sygma Photo News, Inc.*, 778 F.2d at 92; *Peer Int'l Corp.*, 887 F. Supp. at 565; *Lauratex Textile Corp. v. Allton Knitting Mills Inc.*, 517 F. Supp. 900, 904 (S.D.N.Y. 1981); *Chappell & Co. v. Frankel*, 285 F. Supp. 798, 800-801 (S.D.N.Y. 1968).

EMI points to Isabel's and Bienvenido's own testimony, as well as the testimony of Fidel Hernandez, the general manager of Karen Publishing.  Isabel testified that she owned 50% of both Karen Defendants (Bernstein Dec., Ex. U at 3-4), that Hernandez consulted with her before hiring employees and regarding their compensation (*see id* .at 9-10); and that she had the power to fire employees and write checks on behalf of Karen Publishing (*see id.* at 10.)  Isabel also testified that she gave an "order" to an employee in the licensing department to make sure that "Karen Publishing always obtained the right to use songs before the records are released."  (*Id.* at 13.)  Finally, Isabel testified that Bienvenido was responsible for producing the records, including selecting the music that appeared on them, and that he also had the power to fire employees and write checks on behalf of Karen Publishing.  (*See id.* at 8, 10.)

Bienvenido testified that he owned the other 50% of both Karen Defendants and that he served as President of Karen Records and Vice President of Karen Publishing.  (Bienvenido Tr. at 7-8.)  Bienvenido further testified that both he and Isabel had the sole authority to write checks and sign contracts on behalf of Karen Publishing as well as to fire employees of the company.  (*See id.* at 13, 22, 28.)  However, Bienvenido testified that he and his wife employed a division of labor.  According to Bienvenido, as music producer he was personally involved in and almost solely responsible for selecting the artists and music for records released by Karen Publishing.  (*See id.* at 15, 17.)  But Bienvenido testified that Isabel and Hernandez were responsible for obtaining licenses. (*See id.* 18-20).  Nevertheless, Bienvenido admitted that he had regular communications with Hernandez regarding producing records, that he was familiar with the individuals responsible for obtaining licenses, and that he had "been very strict in telling Isabel that they have to ask for the license, that they cannot release anything unless they have the

respective license." (*See id.* 14, 19, 20.)  Moreover, Bienvenido acknowledged that he participated in negotiations to settle EMI's prior lawsuit.  (*See id.* at 24.)

Hernandez also testified that Isabel and Bienvenido essentially had the sole authority to write checks and sign contracts on behalf of Karen Publishing (Bernstein Dec., Ex. X ("Hernandez Tr.") at 3).  Yet, contrary to Bienvenido's testimony that he was primarily the music producer, Hernandez also testified that Bienvenido was "the decision-maker" for the company and was "involved in the financial side of the company."  (*Id.*)  Hernandez also recalled "conversation[s] with Bienvenido as to the need to check the prior recordings that were released by Karen Publishing after" the filing of EMI's prior lawsuit.  (*Id.* at 5.)

Isabel does not appear to contest this evidence.  For his part, Bienvenido argues that, after Isabel became President, he "was not involved in any decision making for many years"; "was only the music producer"; "did not manage the day to day affairs of the business"; never "supervised the actual production and mechanical licenses"; and was "also not involved in the day to day calculation of royalties."   (Marotta Dec. at 6-7.)  In short, Bienvenido argues that he should not be held liable because he delegated ground-level activities to others and did not know about any infringement.

The Court must give Bienvenido the benefit of every inference that he delegated licensing arrangements to others and that he was involved primarily in producing records.   But "[i]ndividuals who have the *right and ability* to supervise infringing copyright activities and a direct financial interest in such activities are not shielded from liability even though they have no knowledge of the infringement."  *Peer Int'l Corp.*, 887 F. Supp. at 565 (emphasis added).  *See also Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963) ("When the *right and ability* to supervise coalesce with an obvious and direct financial interest in the

exploitation of copyrighted materials—even in the absence of knowledge that the copyright monopoly is being impaired—the purposes of copyright law may be best effectuated by the imposition of liability upon the beneficiary of that exploitation.") (emphasis added, internal citation omitted).  Similarly, "even lack of participation in the infringement will not insulate a corporate officer from liability. . . ."  *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F. Supp. 531, 537 (S.D.N.Y. 1977) (same).

Accordingly, courts in this district have consistently rejected defenses to joint and several liability raised by individual defendants who have the power to control their companies' production of infringing materials but argue that they did not actually control the infringement at issue.  Thus, in *Peer International*, Judge Sotomayor found the President and sole shareholder of the corporate defendant jointly and severally liable where he conceded that he "determine[d] what [was] done and what [was]n't done in the corporation, and "admit[ted] that he did nothing to stop the distribution of the compositions at issue after he was served with the Complaint. . . ." *Peer Int'l Corp.*, 887 F. Supp. at 565.

Similarly, the court in *Chappell & Co. v. Frankel*, 285 F. Supp. 798 (S.D.N.Y. 1968) imposed joint and several liability on an individual defendant who had "delegated to . . . his vice-president . . . the job of obtaining the mechanical licenses for the compositions involved" and therefore "had no personal knowledge as to whether licenses for [the] four compositions had been acquired."  285 F. Supp. at 800.  Where the individual defendant was a director and "major shareholder" of the corporate defendants; was "responsible for the arrangement of the songs on the records"; and "negotiated with another company to have the tapes reproduced and manufactured on records," the court held that the individual defendant "caused the whole process of infringement."  *Id.* at 800-801.

21

Likewise, in *Luft*, the individual defendant "negotiated the purchase of the infringing recordings"; "supervised their manufacture, distribution, and sale"; "had a 65 percent interest in the corporation"; and served as president of the corporate defendant. *Luft*, 772 F. Supp. at 1379-80. Noting that the individual defendant "[s]urely . . . benefitted from the profitability of selling the infringing materials," the court held him jointly and severally liable. *See also Sygma Photo News, Inc.*, 778 F.2d at 92 (affirming joint and several liability where individual "exercised control over the infringement" because company "employees," "capital," and "labor produced" the infringing work); *Lottie Joplin Thomas Trust*, 456 F. Supp. at 537 (holding individual defendant jointly and severally liable where "as president and sole shareholder" he "was in a position to supervise all of [the corporate defendant's] activities and had a direct financial interest therein").

The record shows that Bienvenido and Isabel were 50% owners of the Karen Defendants and therefore stood to benefit from those companies' infringing activity. The record further shows that Bienvenido and Isabel had the power to control and were in regular communication with employees responsible for licensing, that Isabel in fact exercised such control, that Bienvenido reminder her of the need to exercise such control, and that Bienvenido produced the albums whose sales amounted to infringement. Perhaps Bienvenido was not actually involved in the licensing or royalties with respect to the four compositions at issue here, but the record shows that he had the power to direct those who were responsible and stood to benefit from those persons' irresponsibility in causing the kind of licensing and royalty improprieties that occurred here. Bienvenido could hardly have been unaware of the need to avoid such potential infringement, since he was involved in negotiating a settlement of EMI's prior suit. What is more, as Bienvenido himself testified, he was responsible for producing records and selecting

22

compositions whose copyrights he had to have known his companies did not own.  Indeed, his testimony regarding his understanding of company policy and his instructions to Isabel suggest that he was acutely aware of the need to obtain licenses for the music he selected.

All of this evidence is more than enough for the Court to find no genuine issue of material fact that Isabel and Bienvenido had "the right and ability to supervise the infringing activity" and "a direct financial interest in such activities."  *Gershwin Pub. Corp.*, 443 F.2d at 1162.

## CONCLUSION

For the foregoing reasons, the Court awards EMI $25,000 in statutory damages for infringement of each composition, for a total of $100,000.  Karen Records, Karen Publishing, Isabel Rodriguez, and Bienvenido Rodriguez shall be jointly and severally liable for such statutory damages.  The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: New York, New York
       August **24**, 2011

_____
        Richard J. Holwell
    United States District Judge